## Campbell, et al. v. Adkins, et al.

(Decided October 27, 1914.)

### Appeal from Carlisle Circuit Court.

1. **Wills—Contest—Verdict—When Will Not Be Set Aside.**—Unless the verdict of a jury in a will case is flagrantly against the evidence, it should not be disturbed.
2. **Wills—Contest—Evidence—Competency of—Hearsay.**—Witnesses introduced for the purpose of giving evidence as to the mental capacity of the testator may relate all facts and circumstances within their knowledge tending to show his mental capacity or want of it, but it is not competent to permit them to relate what other persons said about the condtion of his mind.

R. L. SMITH, BEN S. ADAMS for appellants.

JOHN E. KANE, M. T. SHELBOURNE and JESSE F. NICHOLS for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This is a contest over the will of Mrs. Mollie Adkins, who died in May, 1913. In February, 1912, she made the will about which this controversy arose. Mrs. Adkins at the time of her death was about sixty years of age and had been twice married. Her last husband was J. S. Adkins, who survived her and to whom she had been married more than twenty years. She never had any children, but left surviving her two brothers and a sister and a half-sister. Mr. Adkins had a daughter by a former marriage, who is Elmer Taylor, one of the devisees.

Mrs. Adkins, who had from childhood been a member of the Baptist Church, in her will gave to the Mississippi Baptist Church, with which she had formerly been connected, the sum of $500, and to the Bardwell Baptist Church, in which she had membership at her death, $500. To A. J. Adkins, a brother of her husband, she gave $500, and to Elmer Taylor, the daughter of her husband, she gave her household goods and $500. To her brothers and sisters she gave $1.00 each, and the remainder of her estate, amounting to about $4,000, to her husband.

This contest was instituted by her brothers and sisters upon the grounds that the execution of the will was procured by undue influence and that Mrs. Adkins was mentally incapable of making a will.

On a trial of the contest before a jury, there was a verdict and judgment sustaining the will. The grounds of reversal relied on by the appellants, who were contestants, are, errors of the lower court in the admission of evidence, and that the verdict of the jury is flagrantly against the evidence. No complaint is made of the instructions.

A large number of witnesses were introduced in support of the contentions of the respective parties, and there was of course much difference of opinion between them, especially concerning the mental capacity of Mrs. Adkins; the evidence for the propounders conducing to show that Mrs. Adkins had sufficient mental capacity to make the will and that its execution was not procured by undue influence; while the evidence for the contestants was to the effect that her mind was in such an enfeebled condition that she did not have sufficient capacity to dispose of her property and was influenced to make the disposition she did by her husband. The principal effort of the contestants, however, was directed toward showing a lack of mental capacity.

The evidence shows, without contradiction, that Mrs. Adkins for many years had been afflicted with the disease known as epilepsy, and that she was also a frail, delicate woman. It is also shown, without dispute, that when overcome by one of these attacks of epilepsy, and during the time she was recovering from it, she was wholly incapable of making a will. The witnesses, however, differed widely as to her mental condition between these periodical epileptic attacks. There was evidence on behalf of the contestants by reputable doctors tending to show that epilepsy is a species of insanity and that a person subject to this affliction is not capable of disposing of his property by will; while the evidence on the part of the witnesses for the propounders showed that epilepsy does not necessarily or in all cases affect the mind except at the time when the afflicted person is stricken with the attack or recovering from it, and that between the attacks epileptics are, generally speaking, as well qualified to transact business as persons who are not so diseased.

The will in controversy was made by Mrs. Adkins more than a year before her death, and the reputable attorney who wrote it, as well as other persons, testified that when it was executed Mrs. Adkins was in every respect capable of making an intelligent disposition of her

property. Mr. Shelbourne, the draftsman of the will, who had known Mrs. Adkins from childhood, testified very fully concerning every detail connected with the execution of the will, and gave it as his undoubted opinion that she was, in every respect, capable of executing it and understood thoroughly the nature and quality of her estate, the disposition she wished to make of it, as well as the objects of her bounty and her duty towards them. That he wrote the will entirely from directions given to him by Mrs. Adkins, and that she told him the extent of her estate and of what it consisted and the disposition she desired to make of it. That she said:

" 'I want to remember Elmer Taylor, my step-daughter. I have very largely raised her and she stayed there with me. She was a very obedient, kind girl to me in my affliction; she was very careful of me, and was a good girl, and she is needy and I want to remember her in my will.' I says, 'All right; what do you want to give her?' She said $500. She then said that she wanted to leave her brother-in-law, Jack Adkins, $500; that during her feeble health and her husband's afflictions that Jack had always been attentive, and that he had visited their house many times and would nearly always bring them some vegetables, fresh meat or something, and had been kind and thoughtful of her and her husband, and that she desired to leave him $500.

"She then said that the Mississippi Baptist Church was the church that she had belonged to from the time she was a girl, and that they had built, and the church was in pretty straitened circumstances and she wanted to leave the Mississippi Baptist Church $500. She then said that the Bardwell Church, if I remember right, of which she was perhaps a member at that time, had built a new church house, and was in debt, and that she would leave them $500. She says, 'I have no children, as you know, and I, perhaps, am not long for this world, and I want to leave these churches that much money.' I said, 'What are you going to do with the balance of your estate?' She says, 'I want to leave it to my husband to sustain him in his declining years.' She went on and spoke of Adkins' feebleness and his age, and that he had been very kind and thoughtful of her during their marital relations, and that she wanted to leave him the balance of her estate."

A number of other witnesses, friends and acquaintances of Mrs. Adkins, and who saw her frequently, also

gave evidence as to her mental sufficiency to make a will.

On the other hand, a number of witnesses for the contestants, and who were friends and acquaintances and neighbors of Mrs. Adkins, gave it as their opinion that she was not qualified to make a will, and cited many illustrations showing her lack of memory, her inability to recognize at times old friends, and other acts indicating a diseased mind.

Perhaps it is not too much to say that under the evidence a jury might have found against the will and their verdict would have been supported by sufficient evidence to sustain it. Likewise, there was sufficient evidence, as we think, to sustain the verdict that the offered paper was her last will.

In nearly all cases like this that come under our notice there is much difference of opinion between persons who have equal opportunities of knowing the truth, and this difference of opinion we think often arises from the fact that the witnesses saw the person about whom they were testifying at different times and under different circumstances and conditions. The disinterested witnesses who testified in this case for the contestants no doubt saw Mrs. Adkins on occasions when she was perhaps not capable of making a will, while the witnesses for the propounders saw her and talked with her when she was fully capable of understanding the nature and effect of the paper.

But in this class of cases we have always given great weight to the verdict of a jury, and there are strong reasons why that rule should not be departed from in this case. Mrs. Adkins lived for a great many years within a short distance of the town of Bardwell, and for some thirteen years before her death lived in the town of Bardwell, the county seat of Carlisle County and the place at which this case was tried by a jury of that county. These jurors heard the witnesses testify, saw their demeanor on the witness stand and had the many opportunities that arise in the trial of every case for estimating the weight to be attached to what they said, and we can not say the verdict is so flagrantly against the evidence as to justify us in setting it aside. She gave her property to the churches of her faith and to the people who had been kind and attentive and faithful to her in her afflictions.

It is said, however, that the court committed errors of law prejudicial to the contestants in rejecting offered

evidence, and that for these errors the judgment should be reversed.

It appears that Mrs. Adkins owned in her own right a tract of land in Carlisle County and that she sold this land for about $60 an acre, and it was the money realized from the sale of this land that she disposed of in her will. There is some evidence that this land was worth from $75 to $100 an acre at the time she sold it, and an effort was made on the part of the contestants to prove that some persons who wanted to buy this land were deterred from making an offer because they were under the impression that Mrs. Adkins did not have sufficient mind to sell or convey it.

Boaz Wilson was introduced as a witness for the contestants, and after relating circumstances tending to show Mrs. Adkins was of feeble mind and that the land was worth from $75 to $100 an acre, followed by the opinion that she did not have sufficient mental capacity to dispose of her property, said, on his cross-examination by the attorney for the propounders, that his son looked at the land with a view of buying it but did not do so. Then on his re-examination in chief he was asked: "What was the reason your son did not buy this land?" To this question objection was made and sustained by the court, and it was avowed "that if permitted to answer, the witness would state that he did not buy it because he did not think she had mind sufficient to convey it."

This witness had been permitted to testify fully as to all the facts and circumstances within his knowledge concerning the mental capacity of Mrs. Adkins, and to express the opinion that she did not have sufficient mind to make a will, and it was only when he proposed to assign reasons why his son did not buy the land that the court sustained objections to his testimony. We do not find any error in this ruling. The rejected evidence was hearsay; an attempt to narrate what somebody else said or did as tending to show the mental condition of Mrs. Adkins. The witness had the right to relate all the facts and circumstances within his own knowledge as to her condition, but it was not permissible to let him tell what other people said about her condition.

John Denton, another witness for the contestants, after relating instances showing the failing mind of Mrs. Adkins, said that the land was worth in his opinion $75 an acre. After being cross-examined, he was again put on the witness stand for the contestants, and asked, "I

believe you said yesterday evening that you knew that farm; did you look at that farm or consider buying it? A. Yes, sir. Q. Tell the jury the reason you did not buy it." To this question objection was sustained and an avowal made "that the reason he did not buy that farm was that he was informed that her mind was so she could not make a deed." In other words, it was proposed to show by this witness what his opinion from other sources was as to the mental condition of Mrs. Adkins. This evidence was incompetent as hearsay. He did not say he refused to buy the land because from facts and circumstances within his own knowledge he thought she was not capable of making a deed, but because "he was informed that her mind was so that she could not make a deed."

Another assigned error relates to the evidence of J. W. Turk, a witness for the propounders. This witness, on his chief examination, gave it as his opinion that Mrs. Adkins had mind and memory sufficient to make a will, and also said that he looked at the farm with a view of buying it. He was asked, on cross-examination, by counsel for the propounders: "Now, at the time you were looking at this farm with a view of buying it, you had heard that there was objection to it being sold on account of her mind?" Objection was sustained to this question and an avowal made that if permitted to answer the witness would state "that he had heard that her mind was impaired." He was also asked this question: "I will ask you if you did not ask George Harnett, who lived on the place at that time, whether or not at that time Mr. Haworth and Mrs. Haworth and Bill Campbell objected to the sale on account of the condition of this woman's mind?" Objection was sustained to this question and the avowal made that the witness would answer "that he did."

For the reasons indicated in considering the testimony of Wilson and Denton, we think the lower court correctly ruled in sustaining the objection to the question asked Turk. It would certainly be going far beyond the ordinary limits of examinations to let a witness answer the question that this witness was asked.

Upon the whole case, we have reached the conclusion that no error prejudicial to the rights of the appellants was committed, and the judgment is affirmed.